Diferences between U.S. Stateльnd & 52B The trial court erroneously substituted its own statutory interpretation of the fact of Congress in this case. The trial court correctly noted the absence of any statutory definition of the term United States Import Duty, and correctly concluded that that makes any warranted hearing of Chevron Step 2. What we have here is a detailed determination by Commerce issued after notice in common and review of numerous comments received by over 100 parties. But the notice in common wasn't really for this particular case, it was for a related case. It was for stainless steel wire rods from the Republic of Korea. But as the trial court noted below, Commerce incorrectly suspended its consideration of the issue in this administrative review pending the notice in common proceeding in stainless steel wire rod, and really incorporated by reference the extensive analysis provided in stainless steel wire rods. So really what this court is reviewing, and what the trial court is reviewing below, is the notice in common determination issued in stainless steel wire rod, which is Commerce's policy. For Korea. For Korea, but to be clear, it's Commerce's interpretation of the term United States Import Duty and whether that requires the reduction of safeguard duties from the United States price. And after the notice in common proceedings, Commerce reasonably construed the legislative history and the language of the 1921 Act as creating two categories of duties. The trial court says there's no ambiguity, and yet the entire United States government reaches a different conclusion. How can there be no ambiguity if a government proceeding reaches the other conclusion? Well, Your Honor, I think that... Doesn't that kind of undercut a little bit what the trial court suggested about the language import duties? Yes, Your Honor, I think that there's a fundamental, with all due respect to the trial court, I think there's a fundamental inconsistency. The trial court, ironically, noted that this was a Chevron Step 2 case, noting the absence of a statutory definition, then proceeded, which is why we're appealing, really proceeded to acknowledge Commerce's long-standing practice of not deducting countervailing duties and anti-countervailing duties. It's kind of double counting, right? Well, it's double counting, but it's also, Chief Judge Rustani explained very cogently in the United States, still, it's also a double remedy. And really, that is really one of the errors, in our view, that the trial court made, is it focused very specifically upon the circular logic aspect of deducting, not deducting, not deducting anti-dumping duties. But that's just one of several reasons why anti-dumping duties are not deducted. It's not simply the circular logic. The circular logic wouldn't apply to countervailing duties. Those similarly are not deducted. Really, the issue is a double remedy. And the trial court did not really focus upon Commerce's determination that in this case, because the Section 201 duties are aimed at a harm that is very, very similar to the harm that's aimed at in anti-dumping duties, that therefore, there's a presumption that the President's Section 201 duties did have some effect, and that Commerce may have reasonably construed that there's some effect. And then, under Commerce's methodology, under Commerce's interpretation in the United States, anti-dumping duties is really sort of a self-correcting mechanism, to the extent that the Section 201 duties do not adequately reduce dumping, and there's a dumping margin that would be assessed over and above the Section 201 duties. To the extent that, as in this case, the Section 201 duties are so successful that they can eliminate dumping, then there shouldn't be an imposition of the dumping margin in this case. That is what the law requires. The fundamental tenet motivating Commerce's interpretation is that the anti-dumping law is not punitive. It's remedial, and the remedial effects here of Section 201 duties were successful, and that is why there was a diminutivist margin. So, the trial court, getting back to Your Honor's question, the trial court really started on a Chevron 2 analysis, but then really focused very heavily on whether Section 201 duties are identical, and in every way, anti-dumping duties, and Commerce understood that they were. And to the extent that there's a distinction drawn between anti-dumping duties and Section 201 duties, those are really beside the point, because Commerce is really focusing on the fact that there's an overlapping remedy, overlapping injury that's being addressed by these different remedies. Another area in which the trial court veered off course is relied upon Federal Mogul, and sort of drawing from that is the fact that Federal Mogul was the first in a long series of supported international trade cases upholding Commerce's longstanding practice of not deducting anti-dumping duties, either estimated duties or actual duties, not deducting countervailing duties, be it export subsidies or non-export subsidies, and that this is really the latest evolution that Commerce is making with the issue of the safeguard duties as it arose, and both in the Korean Seal investigation and what we're seeing in this case. Can you address the Nucor? Nucor, yes. Well, Nucor, as Your Honor will know, we rely very heavily upon Nucor, not because, obviously, it's an ITC case, but because in Nucor, the ITC, as this Court held quite properly, considered the very dramatic effect that Section 201 remedies had in that case to find that there was no more material injuries supporting an anti-dumping duty order. So that was just showing that these are overlapping issues, and with all due respect to the trial court, it really never analyzed or addressed the fact that these are fairly overlapping injuries and remedies that address basically the bottom line of the domestic industry. In this case, we know for a fact that the Section 201 duties helped the domestic industry because on page J71, which is part of the Commerce's Issues and Decision Memorandum, this is actually a point that was raised by the petitioners, because the fact of the matter is that we know for a fact, this isn't sheer speculation, we know for a fact that Sahatai paid the Section 201 duties and raised its price in response. On page J71, Commerce's position stated in response to comment two is, and I quote, When the sales finally entered the United States, Sahatai paid for the 201 duties and subsequently invoiced its U.S. customers for the amount of the duties. We verify that Sahatai paid for the Section 201 duties and subsequently invoiced its U.S. customers for the amounts incurred and did not note any discrepancies with respect to these adjustments. The citation for this is in the Sales Verification Report, which is contained in the administrative record of these proceedings. Ms. McCarthy, on that particular point, what if, in fact, the exporter had not paid the amount passed off, the 201 duties to the U.S. market, raising its prices, but paid them themselves, not ask their customers to pay them? Would it make a difference? It doesn't make a difference here, but it says there's a chance they would. No, not here. Would it make a difference? Because obviously the 201 duties there would not be effective. In that case, if the 201 duties are not effective in raising the United States price, then there's still a possibility that Congress would determine that there's still a dumping margin that would address whatever failure occurred. As I was trying to say before, this is really sort of a self-adjusting mechanism that Congress has devised. To the extent that the Section 201 duties is not increasing the United States price, as it's intended to do, either through—it's just not working for a variety of different reasons, and duty absorption being one of them, and Congress determines following that that the importer is still dumping, then the importer will have a dumping margin. It just so happens in this case, that Hatai, we know for a fact, did not absorb the duty. He passed it directly on to his customers. It wasn't an increase in price for any other reason. It was expressly for the 201 duty, and we know that that is exactly what the President intended for the 201 duties, was to help the domestic industry, and there was a price increase. There was no reason. It was perfectly appropriate in this case for Congress to determine that there's a de minimis margin because the Section 201 duties had its intended effect. And under Chevron Step 2, under me, Congress's determination should be for a maximum deficit, should be upheld, and it absolutely does not thwart the objectives of the statute as the trial court held below. It furthers the statute of objectives. It's—Congress's mission is to provide the most accurate dumping margin possible, and in this case, because Hatai had raised its prices in response to a remedial duty imposed by the President, it was no longer dumping, and that is a fair and just outcome here. It should be—Congress's interpretation should be sustained. It's not contradicting the objectives of the statute. Now, even under Chevron 2, reasonable minds may disagree. It may well be that some reasonable person can interpret that Section 201 duties should be deducted, but that's really not the issue here. The issue here is whether Congress's interpretation is so unreasonable, thwarting the statutory objectives, and there's really nothing that's set forth either in Wheaton's brief or in the trial court's opinion below that would suggest that Commerce is thwarting the statutory objectives. Reasonable minds may disagree, but that's just really not even really an issue here. Finally, I'd like to address the issue of the frustration of the President's intent, and one of the—and in this case, Wheaton, in its Apple e-brief, contends that the Department of Commerce unlawfully usurped the President's authority. Let's be clear. The President was silent as to his intent regarding Commerce's treatment of safeguard duties, but the notion— But Commerce is going to be the party that's going to interpret his intent best. They work well, right? Exactly. The point that I was going to make, Your Honor, is that the Department of Commerce is a subordinate agency of the executive branch, and as a matter of fact, if he didn't like what you gave, he'd have changed it. Yes, Your Honor. The President is in charge of the executive branch. If he didn't like Commerce's position, he could have told Commerce. He could have told the Solicitor General not to approve our appeal. He could have told the Department of Justice not to be advocating the position I'm advocating today. So the notion that there was an unlawful usurpation of the President's authority and that somehow the President relied on an Article III court in New York to vindicate his intentions is really something that we take strong issue with. The other—the one final point I just spoke— It's the one point. About—there's—at the end of the trial court's decision, there's a reference to this court's decision in Smith-Corona and suggesting that the safeguard duties must be deducted in order to provide a fair comparison. I think that wholly misreads this court's decision in Smith-Corona as well as a follow-on decision by this court in the Consumer Products Division, SCM. Those decisions made—when those decisions are read together, it's quite clear that the statute provides the comparison that Congress is to undertake. And really, ironically, what was an issue in Smith-Corona was Congress's attempt to propagate a regulation which was challenged as invalid by Smith-Corona and upheld as valid by this court in order to provide a correction or an offset for interest costs, but that wasn't in the statute. So the notion that there's any sort of comparison required for ex-factory prices, that's not in the statute. The statute is really—speaks for itself. And I'd like to move to Congress. Thank you. Thank you. Ms. Carthy. Good morning, Your Honors. May it please the Court, Roger Sheppard on behalf of Plaintiff Attorneys Wheatland and Allopan. Whether this court decides that the language of the statute is clear and that U.S. import duties as contained in the statute means what it says, that U.S. import duties are recognized as those import duties that are published in the harmonized tariff system and are known by law to be an ad valorem rate applied to all imports coming into the United States, or whether you look at this as the trial court did as a Chevron case, the court should uphold the trial court's decision. If it's Chevron, why isn't the deference being properly accorded to the Congress department? Because as the trial court found, it wasn't exercised reasonably. That's the key to Chevron. Chevron is clear. If Chevron said whenever there's any ambiguity in the statute, there's an opportunity for any administrative... There was a lack of reasonability when they went through a lengthy and careful analysis. I'd be happy to explain that, Your Honor. I'm going to have trouble explaining why there isn't double counting. They're the ones that are actually taking account of the remedial nature of the statute and avoiding double remedy. In fact, there is absolutely no double remedy. It's just the opposite. The price is adjusted. This says, we just read on page 71 of the appendix, that the price was changed by the special duties. Now you want to... It's just the opposite, Your Honor. Let me please explain. What's said on page 71 is that Sahatai asked the importer to repay a cost to Sahatai incident to bring these goods into the United States. They could have asked them to repay part of the ocean freight expenses, and the customer repaid Sahatai some of those duties. Subsequently, invoiced is U.S. customers. The amount secured. U.S. customers thus paid a higher price. The President accomplished what he wished to accomplish with his special duties. Yes, he did, but the President never intended that that would eradicate the dumping duties. Why didn't he tell the Commerce Department to change its ruling? First of all, Your Honor, I would differ with... They're the ones who speak for the President, not you. No, actually they do not. The jurisdiction given by Congress to review of decisions by the Department of Commerce goes to the courts. There is no... The courts do not speak for the President. That is the problem. That's the rule of Chevron. Chevron says we defer to those who do. And that's the Commerce Department. Where their decisions are reached... He can fire his Secretary of Commerce if he doesn't like what he's doing. It shouldn't be done over an issue like this, but we should try to get the law correct. And here, what was failed to be brought up this far, but the trial court clearly recognized this, is that Commerce made an upward adjustment to the payment by the U.S. customer to Sahatai. They said, in order for us to try to get this symmetry correct, just as they would do in the case of normal U.S. import duties, and as they do not do if a customer reimburses these special anti-dumping duties, the symmetry by Congress here of trying to get a fair comparison is actually very, very well laid out. Where a farm producer bears direct cost incident to making the sale to the U.S. customer, those are all deducted from U.S. price. Whenever the U.S. customer reimburses the farm producer for any of those expenses, then those are added to U.S. price. If the U.S. customer pays them, as Judge Paharsa asked earlier, what if the U.S. customer just paid the 15% 201 duties? Then, in fact, the domestic industry would have obtained their full relief under 201, and there would be no change in the dumping bill. Congress wouldn't have made an adjustment to the U.S. price if the U.S. customer just paid the U.S. custom service the 201 duties. The only reason they looked here in this record and decided that they needed to make an adjustment to U.S. price is because the U.S. customer reimbursed the direct expense borne by the farm producer. The argument made by the Department of Justice and the Department of Congress that 201 duties and anti-dumping and countervailing duties are all the same because they're all remedial simply isn't a reasonable approach. Anti-dumping and countervailing duties are company and country specific. They change. They change retroactively. And furthermore, as you discussed in the Newport case, it is one thing. It is perfectly appropriate. The Newport decision was an excellent decision. But anti-dumping duties were not added there so that they were not import duties. It was precisely to preserve the remedial nature of the statute. I'm surprised to hear you find anything in Newport that helps you. Oh, absolutely, Your Honor. It's right on point for us. Why? Because of the fact, Your Honor, that in Newport Now, black is not white, Your Honor. What happened in Newport is the ITC said, at the present time, what have the 201 duties done to imports and their impact on the U.S. industry? The 30% duty on cornwall sheet, I can assume, reasonable assumption, we know from the sports decision and motion systems, the statute passed by the Congress of the United States says the ITC will take into account anti-dumping and counter-dumping duties when deciding if there should be an increase in U.S. duties. It says the same thing to the President of the United States. He doesn't need to explain to this court how he took it into account, but you don't have to assume that. If the statute says the President will take into account the AD&CD duties that he has, on the cornwall sheet at the time the President made his 201 duty determination, there were no anti-dumping duties in effect. He said, I'm going to impose a 30% increase in duties. The ITC said this 30% increase in duties has caused a sharp drop in imports, the U.S. industry has increased production shipments and prices, they're no longer suffering an injury. In this case, maybe we can reason that the President imposed 15% because there were dumping duties on about three-quarters of the imports of this product. But would the industry receive its remedy if the farm producers just paid the 201 duties and U.S. producers didn't bear any of that expense? No. No, Your Honor. It's unreasonable, Your Honor. This is clearly unreasonable. They have the trial court properly analyze this in two ways. A, they said, they're nullifying the symmetry of the statute on adjustments. And citing Smith-Corona was appropriate. Yes, they have the authority to decide on indirect expenses. They're the masters of the statute where it's complicated. But direct expenses, there's a symmetry in the statute.  foreign inland freight, brokerage charges, ocean freight, U.S. import duties, then those must be deducted from U.S. price. Where the customer reimburses those, you increase U.S. price. What the trial court said is, my goodness, they're increasing U.S. price. But the President resonated that problem once. He imposed special duties. He raised that U.S. price. Now you want to do it again. No, there's no double down, Your Honor, because when the President imposed the remedy. He's only remedied it once, and you want to remedy it again. No, he meant for the U.S. price. The U.S. price for you, you don't give him. Oh, it's not nice for me at all, Your Honor. But it's the U.S. customer that gets the higher price. Your Honor, the outcome of this. You want him to pay again. The outcome of this case would have been if these duties had stayed in effect for three years, then only because of the imposition of 201 duties, we would have had zero or de minimis dumping duties for three years and a revocation of the order. There is no way this Court can believe that the President actually thinks that we ought to do away with dumping duties if he's imposing 201 duties. It's not the way the statute works, and Congress is clear that the President is assumed to take into account the dumping duties. They do away with them if he's already remedied them by his special duties. If he solved the problem by raising the price, then he would be the first to tell us, as he did through his Commerce Department, you don't need to remedy it again. If that were the case, Your Honor, then, and I recognize we're not cross-talking, then Commerce wouldn't be making any adjustments on either side here. If you say 201 duties are just 201 duties and dumping duties are just dumping duties, then you don't increase the U.S. price. In the dumping case, when just as the special remedies, special duties don't eliminate the margin, of course, then there continue to be anti-dumping duties necessary to eliminate the margin. In this case, it didn't happen. As long as we have a fair comparison, Your Honor, here we didn't have a fair comparison. Really, this double-counting argument, if you take it to its logical extreme, why can't the Commerce Department say that when the farm producer pays U.S. import duties and the U.S. customer reimburses those duties, or maybe they don't, that we're having double-counting? We're double-counting U.S. import duties and dumping duties. Is that fair? Is that fair to these poor U.S. customers? That's really the end result of this double-counting. If you believe there's double-counting in the 201 duties or Section 301 duties, the President can impose increased U.S. duties under Section 301 as well. That's not remedial. That's retaliatory. You say, well, but they're special. They're different. They're not the normal U.S. duties. Then you might as well get rid of all the U.S. duties. But that's not what the Congress intended. I think the court below said, what's in the statute? Yes, we give them Chevron deference. What's in the statute? The statute says the President will take this into account. The statute says we'll have a symmetry of adjustments. And we didn't get that here. And just as, look, we recognize the anti-dumping duties are special duties. A farm producer pays anti-dumping duties, which happens all the time. They get no offset under the statute. If the U.S. purchaser decides to reimburse a portion of the dumping duties the farm producer paid, Congress doesn't make an offset. They don't say. Does that impact the market? If the U.S. Yes, it does, Your Honor. It does impact the market. Yes. It increases the price. There's no question about that. And that gave them. So is that the effect of what 201 wants to do? Yes, it is. It wants to increase the domestic price. And it would be just the reverse of the intended remedial effect of the 201 if, as is argued by the Department and apparently may be accepted by this Court, if you deduct the amount of dumping duties by the amount of 201 duties. Now, what is the remedy? You're just right back at where you were before the President imposed the 201 duties. And that's the outcome. No, the President imposed the 201 duties. You've got a remedy. He raised the price. He solved the problem. And if he doesn't solve the problem, the margin will persist. And there will be anti-dumping duties. That's what Congress tells us. They're speaking for the President. And this Court doesn't tell the Commerce Department they can't speak for the President. Your Honor, if you don't accept the fact that a term U.S. import duties applies to any publication U.S. import duties, and if it's a position of this Court that whenever Chevron is applicable, no matter what the Department does, it's going to be upheld by the Court of Appeals from the Federal Circuit, then there really isn't a need for much judicial review. We'll just let the White House do what they want in all cases, whether it's appropriate or not. We don't think that is the case here. The decision of the trial court was not substituting its own judgment for that of the judgment of the public. The decision of the trial court took the statutes and said that their interpretation wasn't reasonable. And it basically said it doesn't matter if you have an open comment period. The decision isn't reasonable because making an adjustment for the reimbursement and not making an adjustment for the 201 duties nullifies the 201 relief and nullifies under the statutory directive the fact that the President has already been instructed to take the existence of anti-dumping duty orders into account. Furthermore, the trial court found, a la Smith-Corona and the entire line of cases, that there has to be a symmetry in adjustments. And the trial court found clearly that there was no symmetry here so that the interpretation by Congress not only nullified the 201 statute, it nullified the basis of fair comparison that is embodied. I give the Department of Commerce a lot of credit for interpreting the laws, but I give Congress of the United States, going back to 1921, the most credit for having crafted in those days a statute that has worked so well in terms of getting the right fair comparisons. And where there's a question, thank you very much, Your Honor. Thank you, Your Honor. Just a couple of points. First of all, the Statement of Administrative Action does instruct the President to take into account existing anti-dumping duties. And the statute requires the President to take into account numerous complex factors, some of which are subjective, some of which are objective. And the important point is that separate duties apply across the board. The President did distinguish between countries that have anti-dumping duty orders and countries that do not. They apply to 15% across the board for the period of relieving this case. And so, the President took it into account to the best he could, but I don't see how that supports Wheatland's. Is there an unfair comparison here, as Ms. Gershaw would suggest? Well, the fair comparison, as I said, the statute instructs Congress to make numerous different adjustments up and down. In some cases, what happened in Smith-Coroma is that Commerce, because the statute directly addressed direct costs but did not direct indirect expenses, Commerce devised a regulation to provide what was then called the Exporter Sales Price Offset, which was capped. So, again, it was capped, so it wasn't perfect. And that was challenged as being invalid by Smith-Coroma, and this court held that as valid. And it was similarly upheld, and this court also addressed that the cap was not arbitrary or capricious, which was the issue in Consumer Products Division of SCM. The point is that the statute directs what it is. To have the perfect symmetry that Mr. Scheinman's talking about, then Congress would have to deduct anti-dumping duties and countermeasuring duties from export price, which it does not do, and that's been the long-standing practice. And even, I didn't hear Mr. Scheinman challenge that practice here except in the abstract general type of symmetry, and certainly the trial court didn't take issue with that below. That would be a major sea change in the law, and a quite unsettling sea change, if Congress all of a sudden required to deduct anti-dumping duties and countermeasuring duties. Thank you so much for your time.